DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Jacqueline F., appeals from judgments of the Wayne County Juvenile Court that determined her son to be a dependent child and placed him in the protective supervision of the Wayne County Children's Services Board ("CSB"). We affirm.
 {¶ 2} Jacqueline F. is the natural mother of C.F.S., born April 23, 2004. The child's father, Roger S., did not appeal the judgment of the trial court and has appeared as an appellee in this appeal.
 {¶ 3} CSB removed C.F.S. from Jacqueline's custody following a period of approximately two weeks during which she left him with a paternal uncle and *Page 2 
his girlfriend without means of support or of obtaining medical care. On September 7, 2006, CSB filed a complaint with the Wayne County Juvenile Court alleging that C.F.S. was a dependent child pursuant to R.C.2151.04(C). The trial court issued an ex parte order granting emergency temporary custody on the same date and set the matter for a shelter care hearing. Jacqueline and Roger appeared without counsel for the hearing on September 8, 2006, and the matter was continued. On September 14, 2006, the court ordered that C.F.S. remain in the interim temporary custody of CSB pending adjudication.
 {¶ 4} Jacqueline and Roger appeared with counsel for adjudication on October 17, 2006. Jacqueline vigorously opposed the complaint; Roger, along with the guardian ad litem, advocated in favor of the allegations in the complaint. Testimony adduced at the hearing conflicted along roughly the same lines. The court took the matter under consideration and, on November 3, 2006, adjudicated C.F.S. a dependent child. The court ordered C.F.S. to remain in the temporary custody of CSB pending disposition, but also encouraged CSB to evaluate a return to Jacqueline's custody.
 {¶ 5} On December 7, 2006, the court returned C.F.S. to Jacqueline's custody on CSB's motion with an interim order of protective supervision. The guardian ad litem opposed the motion, arguing that she had not been afforded the opportunity to meet with Jacqueline or visit Jacqueline's residence to determine whether the change of custody was in C.F.S.'s best interest. After this time, but *Page 3 
prior to disposition, Jacqueline was incarcerated for a period of approximately forty-four days. During her incarceration, Jacqueline placed C.F.S. in the custody of her parents on her own initiative. From the record, it appears that neither the court nor the other parties to the case were fully apprised of these developments.
 {¶ 6} The court proceeded with disposition nevertheless. Roger moved for temporary custody of C.F.S. in light of Jacqueline's incarceration, and the court requested CSB and the guardian ad litem to consider Roger as a suitable placement. All parties with the exception of Jacqueline, who maintained her objection to the adjudication, agreed that C.F.S. would remain in the protective supervision of CSB and that C.F.S. would remain with his maternal grandparents pending further consideration of Roger's request for temporary custody.
 {¶ 7} Jacqueline filed this appeal following disposition, raising two assignments of error.
ASSIGNMENT OF ERROR I
 "The juvenile court erred to the prejudice of Jacqueline F[.] and [C.F.S.] by an incorrect application of the burden of proof in its dependency finding."
 {¶ 8} In her first assignment of error, Jacqueline has argued that the trial court's statements indicate that it did not apply a clear and convincing standard of proof in the adjudication proceeding. We disagree.
 {¶ 9} In order to adjudicate a child dependent pursuant to R.C.2151.04(C), the trial court must determine by clear and convincing evidence that the child's "condition or environment is such as to warrant the state, in the *Page 4 
interests of the child, in assuming the child's guardianship." See, generally, Juv.R. 29(E)(4). Clear and convincing evidence is that which will produce in the trier of fact "a firm belief or conviction as to the facts sought to be established." In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. In reParsons (Nov. 12, 1997), 9th Dist. Nos. 97CA006662 and 97CA006663, *3.
 {¶ 10} Clear and convincing evidence, therefore, is not unequivocal.State v. Eppinger (2001), 91 Ohio St.3d 158, 164, quotingCross, 161 Ohio St. at 477. To the contrary, evidence may be clear and convincing and yet admit a degree of conflict and uncertainty that is properly resolved by the trier of fact:
 "The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. * * * Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." Cross, 161 Ohio St. at 477-78.
 {¶ 11} Jacqueline maintains that the trial court's statements concerning the clarity of the evidence presented and conflicting testimony during the adjudication hearing belie its judgment that C.F.S. was found to be a dependent child by clear and convincing evidence. Specifically, Jacqueline notes that the trial court *Page 5 
characterized the presentation of evidence as "confusing," criticized the intake caseworker's handling of the case, and emphasized the conflicting loyalties of the witnesses. These observations, however, are compatible with application of the clear and convincing standard of proof Rather than indicating that the trier of fact erred in favor of a lower burden of proof, these statements typify the role of the trier of fact in a contested matter. Jacqueline's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "The finding of dependency was against the manifest weight of the evidence, lacking sufficient proof to satisfy the clear and convincing standard."
 {¶ 12} The Supreme Court of Ohio has recently reaffirmed that the manifest weight of the evidence standard to be applied in civil cases is that standard which was explained in C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, syllabus. See State v. Wilson,113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 24. Pursuant to this standard, a reviewing court will presume that the findings of the trier of fact are correct since the trial judge had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id., quoting Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but *Page 6 
a difference of opinion on credibility of witnesses and evidence is not." Wilson at ¶ 24, quoting Seasons Coal, 10 Ohio St.3d at 81. "Thus, a judgment supported by `some competent, credible evidence going to all the essential elements of the case' must be affirmed." Wilson at ¶ 26, quoting C.E. Morris, 54 Ohio St.3d at syllabus.
 {¶ 13} Accordingly, before this Court will reverse a judgment as being against the manifest weight of the evidence, it must determine whether the judgment of the trier of fact was supported by some competent, credible evidence going to all the essential elements of the case. If the judgment is so supported, then the judgment of the trial court must be affirmed.
 {¶ 14} R.C. 2151.04(C) defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" The focus of a dependency adjudication is not on the fault of the parents, but on the child's environment, including the condition of the home itself and the availability of medical care and other necessities. SeeIn re Bibb (1980), 70 Ohio App.2d 117, 120. In order to establish dependency, therefore, CSB "was required to present evidence of conditions or environmental elements that were adverse to the normal development of the [child]." In re A.C., 9th Dist. Nos. 03CA0053, 03CA0054, and 03CA0055, 2004-Ohio-3248, at ¶ 14, citing In reBurrell (1979), 58 Ohio St.2d 37, 39 *Page 7 
 {¶ 15} Testimony at the adjudication hearing addressed three areas of concern: adequacy of nutrition; access to medical care; and environmental risk due to the presence of unknown transient individuals in Jacqueline's residence.
 {¶ 16} CSB intake caseworker Tina Pettorini testified that she first became involved with Jacqueline and C.F.S. in August 2006. At that time, a referral originated from concerns about Jacqueline's use of physical discipline. On approximately September 4, 2006, Ms. Pettorini made a second contact with Jacqueline, this time in response to concerns raised by Shannon Watts, the fianc É e of Roger's brother, Max.
 {¶ 17} Shannon testified that Jacqueline contacted her sometime in August 2006 and asked that she and Max care for C.F.S. because she had been evicted from her residence, was seeking new housing, and was unable to provide food for the child. Although there was conflicting testimony about the time period during which Jacqueline left C.F.S. with Shannon and Max, witnesses established that it was generally in the range of one or two weeks. Shannon testified that Jacqueline contacted her once during that time to inquire about C.F.S.'s welfare and that she did not provide Shannon and Max with adequate resources to care for C.F.S. in her absence. Shannon recalled that C.F.S. became ill during the visit, but that she met with difficulty in obtaining medical care because Jacqueline neglected to provide her with a medical card. Shannon contacted Jacqueline through a cell phone that *Page 8 
belonged to an acquaintance of Jacqueline's, but Jacqueline neither provided the medical card at that time nor took C.F.S. to the doctor herself.
 {¶ 18} Jacqueline and Shannon planned for C.F.S. to return to Jacqueline's home on September 2, 2006, but for reasons unexplained in the record, C.F.S. did not return at that time. Ms. Pettorini visited Jacqueline on September 4, 2006, in response to Shannon's concerns. During her visit, Ms. Pettorini observed a lack of adequate food in the home — "a box of cereal, a carton of eggs, a galloon [sic] of milk and two cases of beer." According to Ms. Pettorini, Jacqueline informed her that she had no money to purchase food and no plan to maintain food in the home. As a short-term solution, Jacqueline told Ms. Pettorini that she could obtain food from a local church. Ms. Pettorini also testified that, upon inquiring about Jacqueline's food stamp eligibility, Jacqueline informed her that "her ex-boyfriend had used some of the food stamp money to make payments for his car payment, that she was no longer with him and that wouldn't be a problem in the future." Ms. Pettorini testified that she told Jacqueline that she must provide sufficient food before C.F.S. could return. She also addressed with Jacqueline the issue of C.F.S.'s illness and the need for medical treatment. Jacqueline signed a safety plan at the conclusion of their visit, and Ms. Pettorini arranged for C.F.S. to remain with Shannon and Max for a few more days.
 {¶ 19} Ms. Pettorini testified that she visited Jacqueline's home again on September 6, 2006, during normal business hours. Jacqueline confirmed that the *Page 9 
time of Ms. Pettorini's visit was approximately 9:00 a.m. At that time, Ms. Pettorini encountered a man who appeared to be intoxicated:
 "I observed a male lying on the couch who appeared to be intoxicated. I went into the kitchen to look at the supply of food and he stumbled out to the kitchen, very intoxicated, blurred vision, kind of leaning towards me, his pants were down and his bare bottom was showing."
 {¶ 20} The man was later identified as Greg Piars. Mr. Piars was a virtual stranger to Jacqueline, but was the recent acquaintance of a woman later identified as Nikki Boyes. Ms. Boyes shared Jacqueline's residence but was known only to Jacqueline at that time as "Amazon."
 {¶ 21} Ms. Pettorini stated that by her September 6th visit, Jacqueline had obtained sufficient food. She cautioned Jacqueline that it may be unsafe for C.F.S. to be in the home with an intoxicated man and promised to return later. When Jacqueline had removed Mr. Piars from the residence later that day, Shannon returned C.F.S.
 {¶ 22} Max S. testified that when he visited Jacqueline's residence later in the day to check on C.F.S., he found a party in progress. He stated that he discovered C.F.S. naked but for a dirty diaper, running through the house amid eight or nine adult partygoers. Max expressed concern that C.F.S. could have been injured by a tattoo gun in use in the living room and noted the use of alcohol. He testified that he convinced Jacqueline to allow him to take C.F.S. home for the evening and that he later called CSB. Witnesses also testified that Jacqueline's *Page 10 
home was frequented by a stream of casual acquaintances who, by some accounts, were consuming alcohol at various times throughout the day.
 {¶ 23} Witnesses testified that lack of adequate food was a persistent concern both before and after CSB intervened. Shannon, who had been a friend of Jacqueline's for several years, observed that conditions in Jacqueline's home had frequently been poor in the past and that the food supply was low. Laurie Saunders, the ongoing caseworker from CSB, testified that during a visit to Jacqueline's home on the morning of the adjudication hearing, she found only peanut butter, jelly, and beans in the kitchen, despite the fact that the home was shared by Jacqueline, C.F.S., and Ms. Boyes at that time.
 {¶ 24} This Court would agree with the trial court that presentation of this case was at times confusing. The judgment of the trial court is, however, supported by competent, credible evidence that C.F.S.'s environment was such that the state is warranted in assuming guardianship pursuant to R.C. 2151.04(C). Jacqueline's second assignment of error is overruled.
 {¶ 25} Jacqueline's assignments of error are overruled, and the judgment of the Wayne County Juvenile Court is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 11 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
LYNN C. SLABY FOR THE COURT
 MOORE, J. DICKINSON, J. CONCUR *Page 1